May it please the Court. My name is Patricia A. Taylor and I have the honor and duty of representing Mr. Pedro Vega. I would start by saying the District Court granted us a Certificate of Appealability as to claims regarding trial counsel's investigation and presentation of evidence of recantations. And in reality, it's a complete lack of investigation by a lawyer who did not even read his file. And there has never been a case that I could find, and I reviewed many before coming here, that says that it's acceptable for a lawyer to not read his file. The closest case I could find was Rumpilla v. Beard, which I shared with this Court and with counsel last week. The truth is our facts are far more extreme than those in Rumpilla. I did have a quick question early on. Did the priest testify in any of the earlier trials? The priest, you talked about the recantation to the priest? Sir, I'm sorry. I couldn't understand. There was a recantation apparently made to the priest. Yes, sir. Did that priest ever actually testify at any of the earlier trials? There was not. No, no, it was not. There were mistrials where no one. Right. And then prior to that, the trials were not brought. The charges were brought and there was no trial. But the priest never actually testified under oath in the proceeding. That's correct. And the trial lawyer never knew about the priest? Well, he never knew about the priest because he didn't read his files. I understand that. If he had read his files, he would have clearly seen notes where other counsel did interview the priest. I'm trying to understand if the priest really was available to testify as to the recantation. He was available. Why wouldn't he have testified in the previous trials then? If this evidence is in the file, and you want to say that we have ineffective assistance of counsel for failure to read the file, was there anything in that file that might have said, I've talked with Priest Dan, he told me there really wasn't much of a recantation, not impressed? I mean, is there any why wasn't Priest Dan called in the previous mistrials? In the trials that were mistrials? Is that what you're asking? You had a couple of previous trials. You had a couple of times when he was charged and then they were dismissed. But you had a third and a fourth. This is the fifth time he's been charged, right? Didn't you have trials on the third and fourth charges? They were the same charges. There were two mistrials prior to this one. On the mistrials, why wasn't Priest Dan called as a witness in those trials? Because it never got that far. It never reached the jury. Did they complete the evidence? They did not. Do you know why they were called, why they were mistrialed? I don't. I don't recall that, Your Honor. Are you certain that the priest never testified? I am positive the priest never testified. Okay. How do we know what the priest actually would have said? We know from other prior counsel's notes. And then we also know, this Court has the opportunity to know, because after the trial, there was a motion to vacate the trial based upon new evidence, and that was concerning other recantations and specifically Father Dan as the most important one, the recantation that was given to him. But as he provided an affidavit, he testified at that hearing. Father Dan testified at that hearing. So he did. So he did testify. Did he say he wasn't barred by the priest's penitent privilege or something? He wasn't going to testify? Correct. It wasn't a confessional. She did come to him and, you know, I mean, I don't know exactly how that works. He felt comfortable testifying. He said it wasn't a confessional, that she did come to him to speak to him in private. It was just the two of them. But it wasn't a confessional, so he felt free to say that she had said that her father had not done anything and that she wanted, she said, I want to get this off my chest, quote, unquote. My father did not do anything. He didn't do it. Where do we find that testimony? You would find it in the transcript of the motion to vacate. I don't believe the part about needing to get it off his chest is in there. It is a question to the priest. Is it in the record we have? It is in the record that you should. Page citation in the excerpts? Sir? Can you give me the page citation in the excerpts? Okay. Let me see what that page. I think. Oh, boy. I think. Let's see. No, I can't. I've got it with me. I've got it with me, but I can't give you. I don't know whether it's in the excerpts. Sir? Was it put in the excerpts? Yes. I don't remember seeing it. You don't remember seeing the transcript of the motion to vacate? I don't remember seeing the transcript of testimony by Father Dan. Well, it is part of the record. It was document 21-2 of, I believe, the State's document. That was the entire transcript. And in that transcript, Father Dan did testify, and he says that he does remember her recanting. He's asked about the get-it-off-her-chest portion that was in notes of council, prior council. He didn't remember her saying that exactly at that time. This is a 40-year priest, and it was her parish priest, and he does remember her coming to him and saying that my father didn't do anything. He remembers that, and that is in there. He doesn't remember the other things, but they are clearly in the notes of prior council. What other instances of recantation are there that was not presented in the last trial? Okay. And, Your Honor, I'd like to, Your Honors, I would like to bring to your attention that it's not just the recantations. It's the fact that the recantations are different stories. They are different stories, so they are not cumulative in nature. You understand? I understand. Okay. Some of the other recantations are in our exhibits for our Rule 32 memorandum, our hearing memorandum. We had exhibits, and they were admitted at that hearing. There is Exhibit E, where Bianca, who is the alleged victim, originated the dream idea and was asking counsel, well, what if it was a dream I had? What if it didn't happen if it was a dream? That was on ---- I think, Judge, my last question, which is one that I would like you to answer, is what other evidence do we have of recantations? So the dream is not a recantation. We're interested in who else did she tell that her father didn't molest her. She told Gay Adams, who was a counselor, and she told Gay Adams a number of times over a period of months. What's really astonishing to me is that, once again, in that motion to vacate after trial, the state's attorney, and I would quote him, said that he was astonished that he had Gay Adams there and had listed her as a witness, and he had even believed that he had reminded counsel that she was there if he wished to call her, and he did not wish to call her. And this Gay Adams saw Bianca over a period of two months, and Bianca never said her father did it. She said a number of other things, including the dreams. At first it was, I think it's a dream, and then it was it was absolutely a dream, and then it was somebody else did it. The story continued to change, but she never once said that her father did it. What did she say today? Well, she had a dream he rescued her. And what did she say today? Does she believe he did it today? The victim? The victim believed that she was sexually assaulted by the defendant. Was she advocating for him or against him today? Today I have not spoken to her. You don't know? I do not know what she would say today. Okay. What's the last time that you? At trial she said that he did it. Okay. Since then she's not spoken out on the subject? Not that I know of she hasn't. All right. Perhaps to her family, but not to anyone else. There are others that she recanted to that were agents of the state, you know, interviewers. Counsel, you're over your time. I'm going to allow you a minute for rebuttal, but I would like you to if you can just list for us right now the names without any other descriptions of who else she recanted to. She recanted to her mother? Yes, she did. She recanted to her mother. Besides her mother and Ms. Adams and Father Dan, who else did she recant to? She recanted to Gay Adams, which I've already given you. Oh, I didn't bring that. I didn't bring that list up here with me. I will search to it, put it on the rebuttal. Okay. Just real quick, does her mother today believe that she recanted? Your Honor, I haven't spoken to the mother. Thank you. Are you stuck with this record? Excuse me? You have this record. I'm just saying you're stuck with this record. Yes, sir. Yes, ma'am. May it please the Court. I'm Nicholas Clearman from the Arizona Attorney General's Office, representing the Respondents. Let me see if I could clarify some of the record concerns. When I took over this case, I realized that we didn't submit the motion to vacate judgment hearing transcript. And I apologize, but I just recently have realized that. And I submitted it, I believe, on Monday or Tuesday morning. And so that transcript, the Father Dan testimony, is S.E.R. second supplemental excerpts at 428 through 433. In that testimony, he does acknowledge that the victim, who I just referred to as B, actually did recant to him. But he does say that he did not remember her making the statement that she wanted to get something off her chest, and he did not remember her saying words of that nature to him as well. But she did recant. She did. He does remember her recanting to him. Was it after the trial, before the trial? When? The motion to vacate judgment hearing was after the trial. That was a few months after. When did she recant to him? She recanted to him in 1996. And I do want to clarify here. I think there's two sets of allegations. There was three made in 1996. And then there was five more made in 2000. Each of the evidence of recantation or maybe impeachment material that's been alleged only relates to those 1996 allegations. There's no evidence in the record that the victim ever recanted to any of the 2000 allegations. And to answer kind of the procedural history, there was allegations in 1996. It was originally then referred to the U.S. Attorney's Office because the family was living on an Indian reservation. The U.S. Attorney declined it for lack of jurisdiction. At that point, then the State also declined it. And the prosecutor at the time says he doesn't remember, but there are notes of concerns about recantations at that point. And then all the mistrials happened after the 2000 allegations. So it's all concerning the same attorney. Do we have any idea why the – what the grounds were for the mistrials? The first mistrial, there's just a minute entry. And I don't believe there's a transcript. And I could submit to the Court if you'd like. But defense counsel was sick, I believe, on the day of trial. And because of his illness, the Court indicated that it was going to grant it. We never really got to the point as to whether Father Dan was going to be called or not called in that trial. Correct, Your Honor. And the second mistrial, actually, there was a full day of testimony. It's very similar to the testimony that the victim provided at the second trial. The reason that trial – the mistrial was granted in that case is some of the jurors had been discussing the case after the first day of testimony. And they had made statements that the defendant looked maybe mean or possibly even that he looked guilty. So at that point, the Court granted a mistrial. Okay. And Father Dan didn't testify, or at least we didn't get far enough to find out whether he testified in that trial or not. Correct. Correct. And – but in all fairness, at least from counsel's motion to vacate judgment, it does appear that he was unaware that Father Dan even existed as a witness. When the trial finally took place. When the trial took place. Okay. So let's go then to the PCR in the Arizona courts. What cases support the trial court's impression that a lawyer can rely on information from his client, and if the client fails to disclose evidence, that there's no ineffective assistance of counsel, even though the evidence can be found in a written file that is readily available to the lawyer? Well, there's certainly the, you know, I think the Court, and if you look at the case cited in its minute entry that was dealing with a newly discovered evidence claim, it's not exactly on point, I know. And really, when you look at it, it's going to come from Strickland. And I guess under the ADPA, even if this Court says, well, I'm not sure that's a correct interpretation of Strickland, I don't necessarily think it's an unreasonable interpretation. Yeah, but we have, you know, we've got the Wiggins case and Rumpia and other cases in which the Supreme Court has imposed a very strong affirmative duty on defense counsel to investigate. And it seems to me that if we have a duty to investigate, at a minimum, you have a duty to read the notes, the file, of the previous counsel. And if he had read it, he would have found that there was a statement of recantation, which is independent of any other problems that would have been had here. And the fact that the client might have known something about Father Dan and didn't say, hey, what about Father Dan, doesn't mean that the counsel wasn't ineffective in failing to read the file. And, Judge, I think preferably he probably should have read the files. ER-26, actually, or SER-26, the attorney did indicate that he talked with both attorneys. And if they viewed this as such important, strong evidence, I'm surprised why they didn't inform him that he talked to both of those attorneys as well. And also I think there's a strong policy reason maybe of at least requiring some affirmative action on the defendant in this case. Although the curious thing is, is that this wasn't evidence that was sort of unique to the client. This wasn't something that the client knew, a conversation he had with somebody. He wasn't talking with Father Dan. It was just, it would have just been that he might have been, that he said he was aware that they had evidence that she had recanted to Father Dan. And the testimony was at the time that the first defense counsel in the Federal system had learned about the Father Dan recantation from Mr. Vega's then-wife, the victim's mother. And so, and the State court actually found that he was aware of that recantation at the time. And it's certainly the family members, I think it was two weeks, it's SER-467, it was about one to two weeks after the verdict told him about the Father Dan recantation and evidence, again, that they were discussing with, if they wait until just one to two weeks after the verdict, why couldn't they have informed him earlier? I definitely think there's a good policy reason that the court, it's not just on reasonable application. I just don't think to see it as unreasonable application is trickling. But I also believe that the court could have prevented this. The question is whether it is, whether that relieves counsel of his duty to read his own litigation files that have been passed on to him from prior counsel. And I guess, and I guess I'm unsure whether or not he, they actually ever passed those on to him. And then, you know, then it becomes whether he should have had it. So is there some question as to whether he had the files? I think. I thought that wasn't a question. I'm not aware from the record that he actually ever had the files at the time of the hearing. If he did, he does indicate at one of the hearings that he had the one, the one file from the Federal, from the Federal defender. So certainly then if he had that file, then he should have been aware of it. And I thought I understood you just a minute ago to say that the Federal defenders were, I'm sorry, that in the Federal case that they were aware of the Father Dan recantation. And so he certainly should have been aware of that. But it's uncertain whether or not he actually obtained it. It was just a one-sentence answer to a question. And I believe he said that he did not have the file for the State defender from the 1996 allegations. And if I can just clarify also that the victim doesn't, did recant that trial. The jury did hear that recantation. It's SCR 313 through 14 and 344. She openly admitted that she recanted. And she did. Did the defense counsel bring that out? It was actually part of the State's case. And defense counsel did as well, but the State did. The State actually had her admit to the 1996 allegations and then spent a significant amount of time going through why those allegations were inaccurate. And what the victim does is she explained that. She made statements such as, I felt bad for him. I shouldn't have said anything. It was my fault. The mother also. Did she admit that she had recanted to Father Dan? She never admit that she recanted. She admit that she recanted to her mother. And her mother also admits that she placed significant pressure on her daughter to believe it was a dream. How about the counselor? The counselor's statements, actually defense counsel's SCR 463, it was, let me see. I'll make sure I get the right citation. Counsel said that he knew about her and did not want to call her. It's SCR 463 through 64. He said there's no reason to call her. All the information that Gaye Adams would have testified to came out on direct testimony through other witnesses. Wait a minute. If she's recanting to Ms. Adams, how could that come out through other witnesses? That would be hearsay. Well, and because he also said that he was concerned about statements made that there was prejudicial to his case. And certainly Gaye Adams had written in her notes that she believed that the victim was recanting as a way to deal with personal issues because of uproar in the family and the pressure her mother was putting on her. I believe I'm out of time. So Gaye Adams ultimately supported the prosecution or would have is what you're saying? Or do you know? It's a way of looking at it. Certainly, Gaye Adams would have admitted the recantations, but then also there was going to be some additional evidence that would have come in that would have supported the prosecution's case. Thank you very much. Ms. Taylor, I'm going to give you a minute. Your Honor, the people that she recanted to are Ano, I will spell this name for you. It's a Yaqui name. It's A-N-I-A-W-A. And then the second name is Y-O-T-U-M-E. And this is a social worker at the Yaqui tribe. Roxanne Aguilar, Gaye Adams, Detective Maria Dollar, her mother, Father Dan, and her brother, Pedro Daniel Vega. She only spoke of the one recantation at trial, and that was the one to her mother. She didn't speak of any others, and no others were brought out by trial counselor. He had the files. What did the state court do with all those others? In the post-conviction relief, what did the state court say about all of those other recantations? The state court said that it didn't matter because they would have been cumulative. But they were not cumulative because just by the very nature of them being different, I mean, the more stories a person tells about an incident, the less their credibility becomes. You know, it's not the same as telling the same story over and over, saying he didn't do it, he didn't do it, he didn't do it, but saying other things like he didn't do it, someone else did. But is that unreasonable to say that she said this several times and that it was cumulative? I think it's unreasonable, and I think it's particularly unreasonable when you're talking about Father Dan. I mean, as a trial attorney, I would dream of having a priest for a witness. I mean, that would be my closing argument. The priest, she told her priest he didn't do it. You know, that's how strong that argument is to me. And it doesn't matter that she didn't recant the later allegations. It shows her to be an unreliable witness all of the times that she did recant later. At the later trial, the mother was, there was evidence that the mother was pressuring the father for, or the stepfather, I should say, for money. And she made the threat that if he didn't give her money, she was going to report him to the sheriffs. And the trial counsel had those files in his possession. They were in his possession. Thank you very much. We thank both counsel for the argument. The cases will be submitted for decision. The next case on the oral argument calendar is Yee v. Holder. Thank you. Thank you.
judges: Beistline, Schroeder, Bybee